# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

JOHN ZARLING,

    Plaintiff,

v.            **MEMORANDUM OF LAW & ORDER**
                Civil File No. 21-23 (MJD/BRT)

ABBOTT LABORATORIES,

    Defendant.

Mark J. Peschel, Eastlund Hutchinson Ltd., Counsel for Plaintiff.

Eric M. Lloyd, Julia H. Pozo, and Michelle L. DuCharme, Seyfarth Shaw, Counsel for Defendant.

## I.     INTRODUCTION

This matter is before the Court on Defendant Abbott Laboratories' Motion for Partial Dismissal of Plaintiff John Zarling's First Amended Complaint [Docket No. 33] and Defendant's Request for Judicial Notice [Docket No. 39]. The Court heard oral argument on June 17, 2021.

## II.    BACKGROUND

### A.    Factual Background

Plaintiff John Zarling was employed by Defendant Abbott Laboratories ("Abbott"). (Am. Compl. ¶ 1.) Abbott is an Illinois corporation with its principal place of business in Illinois. (Id. ¶ 2.)

### 1. Zarling's Residence

In the Amended Complaint, Zarling alleges that he "was employed by Defendant Abbott Laboratories in the State of California and beginning in May 2017 he was a resident of both California and Minnesota." (Am. Compl. ¶ 1.)

Zarling avers that he and his wife purchased a lake home in Minnesota in May 2017. (Zarling Decl. ¶ 2.) The Zarling Family Trust, with Zarling and his wife as trustees, owns the property. (Id.) The Zarlings pay more than $4,000 per year in property taxes on the property. (Id.) They own a vehicle, a boat, and a jet ski licensed in Minnesota for use at the lake property. (Id.) Zarling avers that he spent 13 days at the Minnesota lake property in 2017, 16 days at the property in 2018, and 26 days at the property in 2019. (Id.; Zarling Decl., Exs. 1, Zarling Family Trust; Zarling Decl., Ex. 2, 2018 Otter Tail County Property Tax Statement.)

Zarling avers that he has performed work for Abbott while at his Minnesota lake house. (Zarling Decl. ¶ 3.) Specifically, in 2018 and 2019, he

participated in more than 75 work-related telephone calls and at least 75 work-related text messages while at the lake property. (Id.) He asserts that he was "on call 24 hours a day, 7 days a week" and would take calls from hospitals to check on patients who arrived at the hospital with a St. Jude device and needed a cardiac device analysis and to schedule future surgeries and clinics he needed to attend. (Id. ¶ 3(a).) He would also receive calls from colleagues who were covering for him at work with questions that were unique to a specific patient, hospital, or doctor. (Id. ¶ 3(b).) His managers, Todd Stewart and Dan Hallisey, knew that Zarling had purchased and was spending time at a lake home in Minnesota. (Id. ¶ 4.) On May 31, 2019, while Zarling was on paid time off in Minnesota, Stewart sent the following text message to Zarling: "Sorry to bug you when you're on PTO, but how does getting all of your INB cleared looking?" and Zarling texted him back. (Zarling Decl. ¶ 4; Zarling Decl., Ex. 3.) Stewart once said to Zarling, "What are you going to do, sit there and watch boats go by." (Zarling Decl. ¶ 4.) On September 3, 2019, Hallisey and Zarling spoke on the telephone, and Zarling joked that while Zarling was in Minnesota, Hallisey did not have to worry because he was at his lake home and not interviewing for a new job. (Abbott's largest competitors are based in Minnesota.) (Id.) Zarling

3

had a company-issued credit card that he used a handful of times per billing period in California for business-related vehicle expenses and entertaining clients; he admits that he did not use the credit card in Minnesota. (Zarling Decl. ¶ 5; Hawks Decl., Ex. C.)

## 2. Agreement

St. Jude Medical hired Zarling in 2005. (Zarling Decl. ¶ 6.) In 2017, Abbott acquired St. Jude. (Id.) Zarling alleges that he was a successful employee, overseeing one of the highest performing sales territories for Abbott in California. (Am. Compl. ¶ 7.)

In March 2019, Todd Stewart, Abbott's Regional Sales Manager, told Zarling that "he was excited to give some of Zarling's long-term accounts to a younger, less-highly compensated employee who did not have the baggage of a wife and children." (Am. Compl. ¶ 8.)

On May 4, 2019, Zarling and Abbott entered into an Employee Agreement. (Am. Compl. ¶ 9; Hawks Decl., Ex. A.) Also on May 4, 2019, Zarling signed an agreement with Abbott, and St. Jude Medical S.C., Inc. – an Addendum to the Employee Agreement entitled the "Term Agreement," which was effective April 1, 2019, through April 1, 2020. (Am Compl. ¶ 9; Hawks Decl., Ex. B, Term

4

Agreement ¶ 1.)  The Term Agreement changed Zarling's at-will employment to a one-year contract expiring on April 1, 2020.  (Id.)  After April 1, 2020, Zarling's employment would continue on an at-will basis.  (Id.)  Zarling alleges that the Term Agreement only guaranteed him compensation for 9 months.  (Am. Compl. ¶ 9.)  The Term Agreement provided that if, during the Employment Term of April 1, 2019, through April 1, 2020, Zarling's employment was terminated "due to a position elimination or a reduction in force," Zarling was entitled to the greater of 50% of his base salary for the remaining period of the Employment Term plus the monthly average of his incentive compensation over the previous 12 months times the number of months remaining the Employment Term or Severance Pay as provided in the Severance Plan in effect at the time of Zarling's termination.  (Term Agreement ¶ 3(B)(i); Am. Compl. ¶ 10.)  However, "[i]n order to receive pay under this Section [], EMPLOYEE must sign a separation and release agreement in the form and manner required by ABBOTT."  (Term Agreement ¶ 3(B)(ii).)

The Term Agreement provided that it would be construed under Minnesota law and that the state and federal courts in Ramsey County,

5

Minnesota would have exclusive jurisdiction over any action relating to the Term Agreement and Employee Agreement. (Term Agreement ¶¶ 5-6.)

Zarling alleges that, at the end of 2019, Abbott began to pressure him to retire. (Am. Compl. ¶ 11.) Some supervisors told him that he should retire before April 1, 2020. (Id.) Zarling refused to voluntarily resign, so Abbott began subjecting him to a hostile work environment and attempted to coerce him to resign, including by creating a false negative performance review. (Id. ¶¶ 12-13.)

Zarling alleges that Abbott effectively eliminated his position in January 2020 by making it impossible for him to carry out the essential functions of his job; Abbott cut him out of key communications, took his sales accounts from him, made him a sales representative without a sales territory and a manager with no one to manage, and cut his salary from $390,000 to $75,000. (Am. Comp. ¶ 14.)

On January 30, 2020, Zarling's new manager, Dan Hallisey, sent Zarling a Separation and Release Agreement, which stated that his last day of employment would be February 4, 2020. (Am. Compl. ¶ 17.) The proposed Separation and Release Agreement precluded Zarling from receiving severance pay. (Id.) Zarling refused to sign the proposed Separation and Release Agreement based

on his concern about severance pay.  (Id.)  Abbott never offered him another version of the Separation and Release Agreement.  (Id. ¶ 20.)

On February 3, 2020, Zarling sent an e-mail to Rebecca Carlstrom, Abbott Employee Relations, stating that it appeared Abbott had eliminated his position.  (Am Comp. ¶ 19.)  Carlstrom responded that she had heard February 4 would be his last day.  (Id.)  Zarling responded that "he did not know what his last day of employment with Abbott would be, but it was not February 4, 2020, and that he was waiting to see what became of the issues he had raised."  (Id.)  No one in Abbott management got back to him about his concerns.  (Id.)

During an April 3, 2020 telephone call, Hallisey and Chad Amato, Area Vice President, told Zarling that Abbott had accepted his resignation.  (Am. Compl. ¶ 21.)  Zarling repeatedly informed them that he had not resigned.  (Id.)  He followed the telephone conference with e-mails to Hallisey and Amato stating that he had not resigned.  (Id.)

### 3. Termination of Zarling's Employment

Zarling alleges that on April 3, 2020, after the end of the Employment Term in the Term Agreement, Abbott terminated his employment.  (Am. Compl.

7

¶ 22.)  Abbott refused to pay Zarling any severance under the terms of the Term Agreement.  (Id. ¶ 23.)

B. **Procedural History**

On January 4, 2021, Zarling filed a Complaint against Abbott in this Court. On March 4, 2021, Abbott filed a Motion for Partial Dismissal of the original Complaint, seeking dismissal of all Minnesota Human Rights Act ("MHRA") claims, a defamation claim, and a breach of contract claim.  [Docket No. 23] Zarling's Complaint alleged that he was a citizen and resident of California and was employed by Abbott in the State of California.  (Compl. ¶ 1.)  He did not allege that he worked or resided in Minnesota.  (Id.)  Thus, Abbott moved to dismiss Zarling's MHRA claims for lack of standing.  [Docket No. 25]

On March 15, Zarling filed the Amended Complaint.  [Docket No. 32]  The Amended Complaint alleges: Count 1: Age Discrimination in violation of 29 U.S.C. § 621; Minn. Stat. § 363A.08, subd. 2; and Cal. Gov. Code § 12940; Count 2: Marital Status Discrimination in violation of Minn. Stat. § 363A.08, subd. 2 and Cal. Gov. Code § 12940; Count 3: Familial Status Discrimination in violation of Minn. Stat. § 363A.08, subd. 2; Count 4: Reprisal Discrimination in violation of 29 U.S.C. § 623(d), Minn. Stat. § 363A.15, and Cal. Gov. Code § 1102.5; Count 5: Breach of Contract; and Count VI: Defamation.

8

Abbott has now filed a Motion for Partial Dismissal of the First Amended Complaint. [Docket No. 33] Abbott seeks dismissal of Counts 1, 2, 3, and 4 to the extent they are brought under the MHRA on the grounds that the Court lacks subject matter jurisdiction because Zarling did not reside or work in Minnesota; Abbott does not seek dismissal of Counts 1, 2, and 4 to the extent they are brought under California and/or federal law. Abbott also seeks dismissal of Count 5, breach of contract, for failure to state a claim.

Abbott has also filed a Request for Judicial Notice. [Docket No. 39] Abbott asks that, with regard to its 12(b)(1) motion to dismiss the MHRA claims for lack of subject matter jurisdiction, the Court take judicial notice of Zarling's business expense records and public records showing Zarling's address, and with regard to its 12(b)(6) motion, the Court take judicial notice of Zarling's employment agreements with Abbott.

### III. DISCUSSION

#### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

##### 1. Legal Standard

"Jurisdictional issues, whether they involve questions of law or of fact, are for the court to decide." Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990). "Moreover, because jurisdiction is a threshold question, judicial economy

9

demands that the issue be decided at the outset rather than deferring it until trial, as would occur with denial of a summary judgment motion." Id.

"In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments." Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993) (citation omitted). "In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction." Id. In "a factual attack on the jurisdictional allegations of the complaint, the court may receive competent evidence such as affidavits, deposition testimony, and the like in order to determine the factual dispute." Id. In a factual challenge, "no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." Osborn, 918 F.2d at 730 (citation omitted).

When addressing a Rule 12(b)(1) motion the Court can, without converting the motion into one for summary judgment, "make credibility determinations

and [] weigh conflicting evidence in resolving the motion." T.L. ex rel. Ingram v. United States, 443 F.3d 956, 961 (8th Cir. 2006), abrogated on other grounds by United States v. Kwai Fun Wong, 575 U.S. 402 (2015).

### 2. Prerequisites to Application of the MHRA

Under the MHRA, "'Employee' means an individual who is employed by an employer and who resides or works in this state." Minn. Stat. § 363A.03, subd. 15. "Courts have generally found . . . that a plaintiff must either reside or work in Minnesota to have standing to assert claims under the MHRA." Wilson v. CFMOTO Powersports, Inc., No. CV 15-3192 (JRT/JJK), 2016 WL 912182, at *5 (D. Minn. Mar. 7, 2016) (footnote omitted) (gathering cases). "The basis for this rule comes from the language of the MHRA itself as well as the general presumption . . . against extra-territorial application of a state's statute." Id. (citations omitted).

The Court concludes that Zarling's MHRA claims must be dismissed for lack of subject matter jurisdiction because Zarling neither worked nor resided in Minnesota during the relevant time period.

### 3. Whether Zarling Resided in Minnesota

"The plain and ordinary meaning of the word 'reside' . . . is '[t]o live in a place permanently or for an extended period.'" Jaeger v. Palladium Holdings, LLC, 884 N.W.2d 601, 605 (Minn. 2016) (citation omitted).

The fact that, in 2019, Zarling spent 26 non-consecutive days at his Minnesota lake home does not show that he "live[d] in [Minnesota] permanently or for an extended period." Jaeger, 884 N.W.2d at 605. He did not live in California in the winter and Minnesota in the summer, like the hypothetical noted by the Jaeger court. Jaeger, 884 N.W.2d at 607. Rather, he spent scattered vacation days in Minnesota when on PTO. (And, in fact, he offers no evidence that he spent any days in Minnesota during 2020.) The fact that, over a period of a year, a vacationer spends less than one month of non-consecutive days in Minnesota cannot be sufficient to show that the individual lived in Minnesota permanently or for an extended period. It does not fit the ordinary meaning of the term "reside." Additionally, it is inconsistent with the Minnesota legislature's intent. If every foreign employer whose employee spent two two-week vacations a year in Minnesota became subject to Minnesota employment laws, state employment law would be thrown into chaos. Minnesota seeks to protect Minnesota workers and regulate Minnesota employers, not regulate

every national or international employer whose employees occasionally vacation in Minnesota.

### 4. Whether Zarling Worked in Minnesota

Zarling did not work in Minnesota. Unlike the plaintiffs in cases cited by Zarling, such as Lapushner v. Admedus Ltd., No. CV 20-572 ADM/TNL, 2020 WL 5106818, at *5 (D. Minn. Aug. 31, 2020), and Wilson v. CFMOTO Powersports, Inc., No. CV 15-3192 (JRT/JJK), 2016 WL 912182, at *2, 6 (D. Minn. Mar. 7, 2016), Zarling was never directed to Minnesota by his employer for work or training. His work never required him to be in Minnesota; he attended no training in Minnesota; he incurred no work expenses in Minnesota; and he had no managers or clients in Minnesota. He suffered no discrimination or other liable conduct by Abbott while in Minnesota. Rather, Zarling worked in California and, while Zarling was on PTO, he occasionally had telephone or text interactions with his colleagues or clients. The only work-related text exchange with a colleague that he provides involves one short text from a colleague that begins by apologizing for interrupting Zarling's PTO. He can cite to no case finding such fleeting work while on vacation in a state to which his employer never directed him for any reason to qualify as working in that state. Cf.

Krutchen v. Zayo Bandwidth Ne., LLC, 591 F. Supp. 2d 1002, 1013 (D. Minn. 2008) ("A person on vacation in Minnesota who happens to do some work during their visit would not be considered an 'employee' under the Minnesota Whistleblower Act unless he or she could allege significant additional employment-related connections to Minnesota. . . .").

Zarling, "a California resident" whose "entire employment with [the defendant] took place in California . . . lacks standing to assert a claim under the MHRA." Longaker v. Bos. Sci. Corp., 872 F. Supp. 2d 816, 820 (D. Minn. 2012), aff'd, 715 F.3d 658 (8th Cir. 2013).

### B. Motion to Dismiss for Failure to State a Claim

#### 1. Legal Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted. In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true. Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do.

Id. (citations omitted).

In deciding a motion to dismiss, the Court considers the complaint and "materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings. For example, courts may consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015) (citations omitted).

### 2. Evidence of Employee Agreement and Term Agreement

In considering Abbott's motion to dismiss the breach of contract claim, the Court considers Zarling's Employee Agreement and Term Agreement without converting the motion into one for summary judgment because

> documents necessarily embraced by the complaint are not matters outside the pleading. Documents necessarily embraced by the pleadings include documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading.

Ashanti v. City of Golden Valley, 666 F.3d 1148, 1151 (8th Cir. 2012) (citation omitted). The Employee Agreement and Term Agreement are necessarily embraced by the Amended Complaint because the Amended Complaint

15

explicitly mentions the documents in multiple paragraphs and the breach of contract claim is based on those contracts.

### 3. Elements of Breach of Contract

"The elements of a breach of contract claim are (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co., 848 N.W.2d 539, 543 (Minn. 2014) (citation omitted). The parties agree that a valid contract was formed, the Term Agreement. They dispute the second and third elements: performance of conditions precedent and breach.

### 4. Whether Zarling Performed the Condition Precedent

Zarling alleges "Abbott has failed to give Zarling the severance pay to which he is entitled under the terms of the Term Agreement." (Am. Compl. ¶ 23.) Abbott argues that the Employee Agreement and Term Agreement required Zarling to execute a release in order to receive severance pay and, because Zarling concedes that he did not, his breach of contract claim fails.

"A condition precedent is an event that must occur before a party is required to perform a certain contractual duty." Minnwest Bank Cent. v.

Flagship Properties LLC, 689 N.W.2d 295, 299 (Minn. Ct. App. 2004) (citation omitted). "[I]f the event required by the condition does not occur, there can be no breach of contract." 451 Corp. v. Pension Sys. for Policemen & Firemen of City of Detroit, 310 N.W.2d 922, 924 (Minn. 1981).

Paragraph 3(B)(ii) of the Term Agreement provides "[i]n order to receive pay under this Section," Plaintiff "must sign a separation and release agreement in the form and manner required by" Abbott. Zarling alleges that the Separation and Release Agreement provided by Abbott "precluded any possibility of Zarling getting severance pay," and he "refused to sign the Separation and Release Agreement." (Am. Compl. ¶ 17.) Zarling does not allege that he signed any other separation and release agreement.

"If a party to a contract unjustifiably prevents the occurrence of a condition precedent, then that party's duty to perform is not excused." Minnwest Bank Central, 689 N.W.2d at 300. "[T]he party to a contract cannot take advantage of the failure of a condition precedent when the party itself has frustrated performance of that condition." In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995).

Zarling alleges that the separation and release agreement required by Abbott and presented to Zarling precluded him from receiving severance pay. Thus, he claims that Abbott made it impossible for him to perform the condition precedent for receiving severance pay: if he did not sign the Separation and Release Agreement, he would not receive severance pay but if he did sign the Separation and Release Agreement required by Abbott, he would not receive severance pay.

The question of whether Abbott unjustifiably hindered Zarling from complying with the condition precedent to obtaining severance pay is a fact-intensive inquiry best addressed after discovery. The Amended Complaint itself alleges that the Separation and Release Agreement offered by Abbott "precluded any possibility of Zarling getting severance pay." (Am. Compl. ¶ 17.) Thus, the Amended Complaint alleges facts from which the Court could conclude that Abbott frustrated Zarling's performance of the condition precedent. Dismissal is not warranted.

### 5. **Whether Abbott Breached the Agreement**

Abbott argues that Zarling fails to allege that it breached the Term Agreement because the Term Agreement states that he is not entitled to

severance pay if he was terminated after April 1, 2020, and Zarling alleges that he was terminated on April 3, 2020. (Am. Compl. ¶ 22.) However, Zarling also alleges that Abbott effectively eliminated his position in January 2020. (Id. ¶ 14.) The question of whether Abbott effectively terminated Zarling's employment before he was officially terminated on April 3, 2020 is a fact-intensive question more appropriately addressed after discovery. Because Zarling alleges that Abbott effectively eliminated his position in January 2020, which was during the term of the Term Agreement, the Amended Complaint itself alleges facts from which the Court could conclude that Abbott breached the Term Agreement before its expiration. The motion to dismiss the breach of contract claim is denied.

Accordingly, based upon the files, records, and proceedings herein**, IT IS HEREBY ORDERED**:

1. Defendant Abbott Laboratories' Motion for Partial Dismissal of Plaintiff John Zarling's First Amended Complaint [Docket No. 33] is **GRANTED IN PART** and **DENIED IN PART** as follows: Abbott's motion to dismiss the MHRA claims is **GRANTED**, and Abbott's motion to dismiss the breach of contract claim is **DENIED**.

2. Defendant's Request for Judicial Notice [Docket No. 39] is **GRANTED**.

3. Defendant's Motion to Dismiss the original Complaint [Docket No. 23] is **DENIED AS MOOT** in light of the filing of the Amended Complaint.

Dated:   June 22, 2021            <u>s/Michael J. Davis</u>
                                                     Michael J. Davis
                                                     United States District Court