# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

JOHN ZARLING,

        Plaintiff,

v.

        **MEMORANDUM OF LAW & ORDER**
        Civil No. 21-cv-23 (MJD/JFD)

ABBOTT LABORATORIES,

        Defendant.

---

Mark J. Peschel, Eastlund Hutchinson Ltd., Counsel for Plaintiff

Eric M. Lloyd, Michelle L. DuCharme & Molly E. Nephew, Seyfarth Shaw, Counsel for Defendant.

---

This matter is before the Court on Defendant Abbott Laboratories' ("Abbott") Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment and its <u>Daubert</u> Motion to Exclude Expert Testimony. (Doc. Nos. 86, 94.) Plaintiff John Zarling opposes the Motions. (Doc. Nos. 113, 120.)

## I.    INTRODUCTION

The Court will grant Abbott's Motion for Summary Judgment in part and deny it in part. The Court will dismiss Zarling's claims for age, marital status, and reprisal discrimination due to a lack of sufficient evidence to create an issue for trial on these claims. To support these claims, Zarling primarily relied on a

stray comment made by his supervisor during a March 2019 meeting and his subsequent complaint to a superior about the comment.  But the Court finds that the isolated nature of these events, their remoteness in time from Zarling's termination, and the fact that a different supervisor was responsible for Zarling's termination, among other facts, belie any notion that Abbott terminated Zarling based on discriminatory motives.

The Court will not, however, dismiss Zarling's breach of contract claim for severance pay as the parties' differing allegations concerning the events leading up to Zarling's termination and their differing interpretations of his employment contract create issues that must be resolved at trial.

The Court also will not entirely dismiss Zarling's defamation claim against Abbott because Zarling has presented sufficient evidence to create an issue for trial as to whether the statements in his 2019 Performance Assessment were made with "malice" in an effort to push Zarling to resign.

Finally, the Court will grant Abbott's <u>Daubert</u> motion in part and deny it in part.  The Court will preclude Zarling's expert witness, Stan V. Smith, Ph.D., from presenting testimony on "hedonic damages" at trial for similar reasons as various other courts that have precluded Smith from providing testimony on this

topic.  But the Court will not preclude Smith from providing rebuttal testimony regarding Zarling's post-Abbott job search in response to Abbott's vocational expert, Amy Koellner.  Nor will the Court preclude Zarling's other rebuttal expert witness, Jennifer Bey, from providing her opinion that Zarling's post-Abbott job search may have been impacted by age discrimination.

## II.    BACKGROUND

### A.    Zarling's Background at St. Jude/Abbott

Plaintiff John Zarling began working for St. Jude Medical, S.C. (later acquired by Abbott) in 2004 as a Cardiac Rhythm Management ("CRM") sales representative in California's San Francisco Bay Area.  (Doc. 97-1, Ex. A at 32:7-17, 35:8-36:1.)  After a promotion in 2012, Plaintiff became a Territory Manager and managed a team of sales representatives and technical service representatives in addition to continuing to perform his duties as a sales representative.  (Id. at 38:8-19, 39:2-25, 40:8-41:23.)

### B.    In Early 2018, Zarling Discusses Retirement with his Supervisors

In February 2018, Plaintiff's manager was Regional Sales Manager Todd Stewart.  (Doc. 97-1, Ex. D.)  Abbott's Division Vice President, above Stewart, was Joseph Provost.  (Id., Ex. A at 66:11-16; Ex. G.)

On February 14, 2018, Zarling sent an email to Stewart with the subject line "Future." (Doc. 97-1, Ex. B.) In the email, Zarling asked for new employment contracts and pay raises for himself and some of his coworkers. (Id.) He also conveyed a plan to turn some of his sales accounts over to coworkers over the next few years as part of an apparent retirement plan. (Id.) Zarling stated that "[b]y July 2019, active transition should be occurring . . . I may stay around after 2019 but not as an active CRM rep." (Id.)

Stewart discussed Zarling's request with other Abbott employees, including Provost, by email. (Doc. 97-1, Ex. G.) In these emails, Stewart wrote that Zarling was "At Will, and our intention is to have a viable succession plan in place." (Id.) Stewart also expressed concern that Zarling would leave Abbott for a competitor if Abbott did not honor his request for a new employment agreement. (Id.) Stewart wrote in one email to Zarling, "I will sleep better at night once the ink is dry," apparently in reference to Zarling signing a new employment agreement. (Doc. 97-1, Ex. F.) Zarling alleges these emails show that Abbott saw him as a flight risk, especially considering that one of his coworkers had recently left for a competitor and took a substantial amount of business with him. (Doc. 116, Ex. 1 at 45:5-7, 302:6-303:21.)

In August 2018, Zarling signed a new two-year employment agreement with Abbott.  (Doc. 97-1, Ex. A at 70:19-71:4; Ex. C at 52:19-54:15.)  The contract was effective back to January 1, 2018 and expired on January 1, 2020.  (Id.)

Zarling continued to work as a sales representative and Territory Manager for the remainder of 2018 and received high ratings in his 2018 Abbott Performance Assessment.  (Doc. 116, Ex. 2 at 208:13-210:8; Ex. 23.)  Earlier, in 2017, Abbott had awarded Zarling "Territory Manager of the Year" for the Pacific Northwest.  (Id., Ex. 22.)  Abbott also recognized Zarling as one of its top performing sales representatives nationwide in 2018.  (Doc. 117, Ex. 7.)

### C.     Abbott Hires Several New Sales Employees in the Bay Area

Around October 2018, Stewart recruited five new employees from a competitor, Medtronic, to work for Abbott in the Bay Area.  (Doc. 116, Ex. 1 at 58:24-59:9; Ex. 2 at 62:18-63:1; Ex. 35 ¶ 1.)  Zarling alleges that Abbott had high expectations for the amount of new business these former Medtronic employees would bring, but they ended up performing far worse than expected.  (Doc. 116, Ex. 1 at 63:7-64:15; Ex. 35 ¶ 1.)  Zarling claims that Stewart then set out to use him as the "fall guy" for this failure.  (Doc. 113 at 4.)

In early 2019, Liane Teplitsky became the Area Vice President below Provost.  (Doc. 97-1, Ex. E at 17:15-23.)  Teplitsky also became Stewart's immediate supervisor.  (Doc. 116, Ex. 2 at 30:6-10.)

Zarling alleges that Teplitsky asked him to provide her with a plan to improve the sales performance of the new team of former Medtronic employees.  (Doc. 116, Ex. 1 at 183:12-184:18.)  Zarling sent an email to Teplitsky and Stewart with his proposal for the Medtronic team on March 18, 2019.  (Id., Ex. 1 at 183:12-184:18; Ex. 8.)  In the email, Zarling also wrote the following about his retirement plans:

> I have gone back and forth on how long I would like to work.  If there was a plan in place that I felt comfortable with for the teammates, patients and physicians that allows me to leave in 2 years, with a transition starting as soon as we want, that would work for me.

(Id., Ex. 8.)  Zarling also proposed that Abbott pay him a guaranteed salary through the end of 2020 and added the following proposal: "I end my run in Dec[ember] of 2020 unless some other agreement is made."  (Id.)

A March 26, 2019 email from Teplitsky reiterates Zarling's request for a guaranteed salary through the end of 2020, stating that Zarling "had planned to retire this year, but would like to stay on for an additional 1.5 years and ensure a

smooth transition of his business to people he trusts." (Doc. 116, Ex. 4.) Around this time, Teplitsky and Stewart also prepared a PowerPoint presentation that reflected a plan to transition some of Zarling's accounts to Nick Bosanquet, one of the new employees from Medtronic. (Doc. 97-1, Ex. C at 120:6-12, 121:25-123:4; Ex. J.)

### D.   The March 29, 2019 Meeting

On March 29, 2019, Zarling met with Teplitsky and Stewart to discuss his compensation requests and retirement plans. (Doc. 97-1, Ex. A at 189:9-190:23.) Zarling alleges that Teplitsky and Stewart rejected his proposal for a guaranteed salary through the end of 2020 at this meeting and told Zarling that they would be reassigning 60% to 70% of his sales accounts to other team members. (Doc. 116, Ex. 1 at 71:15-72:22, 189:9-190:16.) Abbott did, however, offer Zarling a new employment agreement with a guaranteed salary through the end of 2019. (Id. at 70:22-71:4, 71:15-20, 200:14-19.) Stewart and Teplitsky also proposed shifting much of Zarling's work from sales to mentoring other team members who would be taking over for Zarling when he retired. (Doc. 97-1, Ex. A at 204:12-205:19.)

Zarling also alleges that Stewart made comments at the March 29, 2019 meeting that form the basis for Zarling's discrimination claims in this litigation. According to Zarling, Stewart stated that he was excited about the prospect of

Bosanquet taking over some of Zarling's accounts because Bosanquet had no

"baggage."  (Doc. 97-1, Ex. A at 191:19-193:11.)  Zarling further alleges that when

he asked Stewart what he meant by "baggage," Stewart explained that Bosanquet

did not have a spouse or children and could, therefore, entertain clients all the

time.  (Id.)  Zarling also testified that he recalls Stewart saying the word

"younger" during this meeting, but Zarling cannot recall in what context.  (Id. ("I

do not remember . . . the rest of that conversation.").)  At the time of this meeting,

Zarling was 56 years old, Stewart was 45 years old, and Bosanquet was 37 years

old.  (Id., Ex. A at 193:22-25; Doc. 113 at 26.)

On April 5, 2019, Zarling complained to Teplitsky about Stewart's

"baggage" comment.  (Doc. 116-1, Ex. 1 at 198:2-199:13, 204:1-11.)  Zarling alleges

that Teplitsky apologized to him about the comment.  (Id.)

Shortly after Zarling allegedly complained to Teplitsky, Stewart sent

Zarling a text message containing an image of the actor Denzel Washington with

an annoyed look on his face.  (Doc. 116, Ex. 1 at 238:12-239:2; Ex. 2 at 95:2-96:22;

Ex. 31.)  Zarling alleges Stewart's text is proof Teplitsky told him about Zarling's

complaint, but Stewart testified that Teplitsky never told him about Zarling's

complaint.  (Doc. 97-1, Ex. C at 96:23-94:5.)  Zarling alleges he found the image to

be intimidating, however, the remainder of this text message conversation between Zarling and Stewart was friendly in tone. (Doc. 116, Ex. 1 at 238:12-239:2; Ex. 31.)

Zarling testified that, outside of Stewart's comments at the March 29, 2019 meeting, no one else at Abbott ever made any comments about his age or marital status that he found disparaging. (Doc. 97-1, Ex. A at 319:7-14.)

### E.    Zarling's 2019 TOY Employment Contract

On April 12, 2019, Teplitsky and Stewart emailed Kami Hawks, an Abbott Human Resources employee, and asked her to prepare a new employment contract for Zarling that reflected the plan they had proposed to Zarling at the March 29 meeting. (Doc. 97-1, Ex. C at 114:11-115:21; Ex. E at 79:14-21, 82:17-84:5; Ex. K.; Ex. L.) In these emails, Stewart expressed his belief that "Zarling is only staying through the end of 2019." (Id., Ex. K.) Teplitsky shared this belief. (Id., Ex. E at 84:3-5.)

In May 2019, Zarling executed a new Term of Years ("TOY") employment contract, which was effective back to April 1, 2019. (Doc. 97-1, Ex. M.) This 2019 TOY contract provided Zarling with a guaranteed salary of $292,500 for the remainder of 2019. (Id.) The TOY contract also specified that Zarling's

employment term would expire on April 1, 2020—three months after the expiration of Zarling's two-year 2018 employment contract.  (Id.)  But under the terms of the 2019 TOY contract, Zarling's salary would revert to a base level for a sales representative of approximately $75,000 on January 1, 2020.  (Id.; see also Doc. 97-1, Ex. A at 276:16-22.)

### F.     Abbott Alleges Zarling's Work Performance Declined Throughout 2019

After signing the 2019 TOY contract, however, Abbott alleges that Zarling's performance declined and that he "equivocated" about his retirement plans.  (Doc. 95 at 5.)

In October 2019, Zarling met with Stewart, Teplitsky, and Abbott Regional Sales Director Dan Hallisey.  (Doc. 97-1, Ex. A at 295:11-297:9; Ex. P at 34:2-24.) Zarling testified that he was pressed for details about his retirement plans at this meeting, but he replied that he had not made any firm decisions about when he would retire.  (Id., Ex. A at 295:11-297:9.)  Zarling admits that he knew Stewart and Teplitsky were planning for him to retire on or about January 1, 2020 and that they even spoke to him about having a retirement party in December 2019. (Id.; see also id., Ex. A at 210:5-10, 297:5-7.)

After it became apparent that Abbott and Zarling were not aligned on Zarling's retirement plans, however, Stewart prepared a "Report on John Zarling" and a 2019 Performance Assessment in which he made several allegations that Zarling's work performance was declining. (Doc. 97-1, Ex. O; Ex. U.) However, Zarling contends that Stewart's allegations about his declining performance were false. Specifically, he alleges the following statements from his 2019 Performance Assessment are false and defamatory:

> In 2019, John partially achieved expectations when it came to mentoring Jaclyn, Nick, Rachel, Sam and Victoria. John did not achieve expectations in Sales Revenue Performance. John did not achieve expectations as a Territory Manager and Team Leader. When asked by 2 Teammates to help with a customer that John has a long history of success with, John defiantly did not offer any help. John refused to work with all of the new team members creating a toxic work environment in many situations. Despite multiple attempts to convince John to utilize a shared work calendar, he refused and demonstrates a total lack of transparency. This lack of transparency caused many avoidable situations that cost the team to lose business. Likewise, on multiple occasions John left town on Vacation without sharing it on the dedicated vacation calendar, nor did he inform his team members or management creating even more toxicity. Overall, 2019 was a very disappointing year for John as a Sales Rep, Territory Manager, and Teammate. He will need to make significant changes in his behavior, transparency, and performance in order to continue to be a part of the organization moving forward.

(Doc. 32, First Am. Comp. ¶ 13; Doc. 97-1, Ex. O.)

G.   **In Late 2019 and Early 2020, Zarling Alleges Abbott Pressured Him to Resign**

In early December 2019, Teplitsky met with Zarling again about his retirement plans.  (Doc. 97-1, Ex. A at 205:25-206:25, 216:6-20, 241:12-17; Ex. E at 107:4-109:14.)  Zarling alleges that at this meeting Teplitsky was "aggressive" and told him that he could either resign at the end of 2019 as she and Stewart had expected or Zarling could continue at Abbott, but his guaranteed salary would not be extended, and he would be put on a performance improvement plan.  (Id.; see also Doc. 97-1, Ex. FF.)  Zarling testified that he does not believe Teplitsky's proposal was linked to his age or marital status.  (Doc. 97-1, Ex. A at 216:6-20, 241:12-17.)

On December 18, 2019, Stewart opened a performance case about Zarling with Abbott's Employee Relations department.  (Doc. 97-1, Ex. C at 160:11-161:22; Ex. S at 22:23-23:1; Ex. T; Ex. U.)  As part of this effort, Stewart provided his Report on John Zarling and 2019 Performance Assessment to various employees at Abbott.  (Doc. 116, Ex. 6 at 106:9-17; Ex. 9 at 150:9-15; Ex. 19.)

Zarling did not respond to Teplitsky's proposal and Teplitsky left Abbott near the end of December 2019.  (Doc. 97-1, Ex. E at 134:21-24.)  Zarling left for a two-week holiday vacation around this time and did not return to work until

January 11, 2020.  (Doc. 97-1, Ex. A at 96:2-8.)  While Zarling was on vacation,

Hallisey replaced Stewart as Zarling's direct supervisor.  (Doc. 97-1, Ex. P at 20:9-

11; Ex. C at 47:22-48:4.)  Stewart testified that after Hallisey replaced him in this

position, he was no longer "in charge of [Zarling's] accounts or what was going

to happen" in terms of Zarling's continued employment at Abbott. (Doc. 97-1,

Ex. C at 47:22-48:4, 142:13-23, 187:6-9.)

Zarling alleges that when he returned from vacation in mid-January 2020,

he found that he no longer had any sales accounts, was not receiving emails from

his sales team, was not scheduled on the "on-call team," and was removed from

his team's scheduling software.  (Doc. 116, Ex. 1 at 96:3-8, 227:18-228:24, 229:14-

16; Ex. 16.)  According to Zarling, Abbott had eliminated his responsibilities as a

sales representative and Territory Manager altogether.  (Id.)  Zarling submitted a

declaration from his former coworker, Bosanquet, in which Bosanquet alleges

that Hallisey told him that Zarling had retired on January 1, 2020.  (Doc. 116, Ex.

34.)  Bosanquet further alleges that Hallisey told him he should inform Zarling's

remaining accounts that he would be replacing Zarling as their sales

representative going forward.  (Id.)

On January 14, 2020, Zarling and Hallisey met to discuss Zarling's employment status. (Doc. 97-1, Ex. A at 218:1-220:23, 224:3-5.) On January 16, 2020, Zarling sent Hallisey an email summarizing their conversation. (Id., Ex. A at 214:14-215:5; Ex. V.) Zarling asked for an "update" on obtaining an early release from his 2019 TOY employment contract, which did not expire until April 1, 2020, and asked about his ability "to purchase COBRA Blue Cross health insurance" after his departure from the company. (Id., Ex. V.) Zarling wrote that Teplitsky had "indicated before her departure that was possible, with a Feb[ruary] 4th separat[ion] being ideal . . . [i]f that date is not possible; sooner would be better than later." (Id.) Hallisey then sent emails to Abbott human resources asking them to prepare a mutual release agreement for Zarling to sign and stating that Zarling "communicated that February 4th would be his last day." (Id., Ex. W.)

Around this time, Zarling told his friend and coworker Steven Hofstadter that he was frustrated with how Abbott was treating him. (Doc. 97-1, Ex. A at 301:11-302:5; Doc. 32, First Amd. Compl. ¶ 15.) Hofstadter volunteered to call Divisional Vice President Provost on Zarling's behalf to discuss Zarling's concerns. (Doc. 97-1, Ex. A at 303:22-304:24; Doc. 116, Ex. 33, Hofstadter Decl.)

Hofstadter called Provost on January 16, 2020.  (Id.; see also Doc. 100, Provost Decl. ¶ 3.)  During the call, Provost shared with Hofstadter some of the performance allegations about Zarling, which Provost had heard from Teplitsky and Stewart.  (Doc. 100, Provost Decl. ¶¶ 5-6; Doc. 116, Ex. 33, Hofstadter Decl. ¶¶ 3-4.)  Provost alleges that he only shared these allegations with Hofstadter because he thought that Hofstadter "had only heard Mr. Zarling's side of the story" and wanted to provide "some context for the situation."  (Doc. 100, Provost Decl. ¶¶ 4-5.)

After hearing what Provost told Hofstadter on the call, Zarling made a complaint to Abbott's employee relations hotline, alleging that he was experiencing a hostile work environment.  (Doc. 97-1, Ex. X at 18:1-11; Ex. Y; Ex. Z.)  On February 3, 2020, Zarling complained to employee relations again, stating that his position had been effectively eliminated because his accounts had been reassigned.  (Doc. 97-1, Ex. CC.)  Zarling does not recall complaining about any type of age or marital status discrimination in his reports to employee relations. (Id.; see also Doc. 97-1, Ex. A at 254:6-255:3.)

An Abbott employee relations manager, Rebecca Carlstrom, investigated Zarling's complaints.  (Doc. 97-1, Ex. X at 22:17-23:22, 33:8-34:7, 34:21-36:11.)

Carlstrom determined that Zarling's complaints were unfounded after speaking with other Abbott employees who told her that Zarling had already voiced his intention to leave the company and that a separation agreement had already been prepared for him.  (Id. at 33:8-34:25, 35:17-36:11.)

On January 30, 2020, Hallisey sent Zarling the proposed separation agreement including a release from his 2019 TOY employment contract and a Termination Date of February 4, 2020.  (Doc. 97-1, Ex. A at 258:3-20; Ex. P at 92:12-16; Ex. AA; Ex. BB.)  On February 3, 2020, Zarling sent a text message to Hallisey stating "I will not be signing the separation and release agreement . . . I am waiting on other severance package information."  (Id., Ex. A at 91:22-92:2; Ex. P at 93:2-15; Ex. DD.)

## H.    Abbott Terminates Zarling's Employment in April 2020

Zarling continued to be employed by Abbott throughout February and March 2020.  (Doc. 97-1, Ex. A at 248:4-249:19.)  On March 24, 2020, Hallisey emailed human resources again to inquire about Zarling's employment status.  (Id., Ex. P at 95:18-97:13; Ex. EE.)  Hallisey also emailed Chad Amato, an Area Vice President at Abbott, asking "[w]hat else can I do to try and get a resolution to John's situation?"  (Id., Ex. EE.)

Around this time, Kami Hawks in Abbott human resources and Susan Percy in employee relations reviewed Zarling's employment records at the request of Hallisey.  (Doc. 97-1, Ex. R; Ex. W.)  Abbott alleges that Hawks and Percy concluded that Zarling had already "voluntarily resigned from his employment" and that all Abbott had to do in this situation was accept Zarling's previously offered resignation.  (Doc. 99, Hawks Decl. ¶ 7; Doc. 97-1, Ex. Q at 27:3-32:20, 57:15-58:11, 59:19-60:11; Ex. R.)  Percy prepared "talking points" for Hallisey to use when speaking with Zarling that were consistent with her conclusion that Abbott could end Zarling's employment by simply accepting his resignation.  (Doc. 97-1, Ex. S at 127:8-17; Ex. GG.)  In the talking points, Percy directed Hallisey to tell Zarling, if asked, that "this is not a position elimination and you will not be receiving a separation package."  (Id., Ex. GG.)

On April 1, 2020, Zarling's 2019 TOY employment contract expired and he became an at-will employee.  (Doc. 97-1, Ex. M ¶ 1.)  On April 2, 2020, Hallisey asked Zarling for a meeting the following day.  (Id., Ex. DD.)  On April 3, 2020, Hallisey, Amato, and Zarling met and Hallisey followed the talking points prepared for him by telling Zarling that Abbott was "accepting his resignation" effective immediately.  (Id., Ex. A at 279:17-21; Ex. P at 99:9-100:1; Doc. 99, Hawks

Decl. ¶ 7.)  After the meeting, Zarling immediately emailed Carlstrom, Hallisey, and Amato stating, "I want to make it clear that I did not resign . . . [b]ecause you are terminating me, I believe I am entitled to severance under the company's plan."  (Doc. 97-1, Ex. HH.)  While the parties dispute whether Abbott terminated Zarling or simply accepted his resignation, it appears to be undisputed that after this April 3, 2020 meeting Zarling was no longer employed at Abbott.  (Id., Ex. A at 282:10-11.)

## I.     Procedural Background

Zarling filed his initial Complaint in this case on January 4, 2021 after submitting his discrimination claims to the Equal Employment Opportunity Commission for review.  (Doc. 1.)  Zarling filed his operative pleading, his First Amended Complaint, on March 15, 2021.  (Doc. 32.)

On June 22, 2021, the Court granted in part and denied in part Abbott's Motion to Dismiss.  (Doc. 59.)  The Court dismissed Zarling's Minnesota state law claims brought under the Minnesota Human Rights Act but did not dismiss Zarling's breach of contract claim seeking severance pay.  (Id. at 19-20.)

Abbott has now moved for summary judgment on all of Zarling's remaining claims and has filed a Daubert motion seeking to preclude Zarling's

expert witness on damages from providing certain testimony at trial and his

vocational expert from testifying regarding the effects of age discrimination on

Zarling's post-Abbott employment search.  (Doc. Nos. 86, 94.)  The Court heard

oral argument on Abbott's motions on December 6, 2022.  (Doc. 131.)

## III.   DISCUSSION

### A.   Abbott's Motion for Summary Judgment

Zarling asserts the following remaining[1] claims against Abbott in his First

Amended Complaint:

Count 1: Age Discrimination (28 U.S.C. § 621; Cal. Gov. Code § 12940)

Count 2: Marital Status Discrimination (Cal. Gov. Code § 12940)

Count 4: Reprisal Discrimination (29 U.S.C. § 623(d); Cal. Gov. Code § 1102.5)

Count 5: Breach of Contract

Count 6: Defamation

---

[1] The Minnesota Human Rights Act claims the Court dismissed included portions of Counts 1, 2, and 3, and the entirety of Count 4 (Familial Status Discrimination).  (Doc. 59.)

### 1.   Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Id. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### 2.   Zarling's Age & Marital Status Discrimination Claims (Counts 1 & 2)

Zarling asserts claims for age and marital status discrimination under California and federal law.  Cal. Gov. Code § 12940(a); 29 U.S.C. § 623 (ADEA).  As a threshold matter, Zarling argues that his discrimination claims are based on direct, as opposed to circumstantial, evidence.  The Court finds otherwise.

Zarling relies on Stewart's comments at the March 29, 2019 meeting and cites DeJung v. Superior Court, 169 Cal. App. 4th 533, 550 (2008) for his direct

evidence argument.  But the comments the court found to be direct evidence in

DeJung are distinguishable.  In DeJung a decision-maker told the plaintiff that

the defendant would not hire him because "they want somebody younger,

maybe in their 40's."  Id. at 540.  Here, Stewart's baggage comment described

another employee, Bosanquet, and did not occur in the context of a hiring

decision.  Further, and as will be discussed more below, Zarling's allegation that

Stewart used the word "younger" at some point during their conversation is too

vague to constitute evidence of discrimination, let alone direct evidence.  The

Court thus concludes that Zarling's discrimination claims are based on

circumstantial evidence and analyzes them accordingly.

In the case of age and marital status discrimination claims based on

circumstantial evidence, both California and federal law utilize the burden-

shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 919 (8th Cir.2000); Arnold v. Dignity

Health, 53 Cal. App. 5th 412, 424 (2020).  Under this framework, Zarling must

first establish a prima facie case.  Id.  For his age discrimination claims, this

requires Zarling to show that (1) he was a member of the protected age group,

i.e., at least 40 years old, (2) he was qualified to perform his job, (3) he was

subjected to an adverse employment action, and (4) he was replaced by a person

sufficiently younger in age to permit the inference of age discrimination.  Fisher,

225 F.3d at 919.  For his marital status claim, California Labor Code § 12940(a)

requires Zarling to show that Abbott terminated him or otherwise discriminated

against him in "compensation or in terms, conditions, or privileges of

employment" because of his marital status.

There is no dispute regarding the first, second, and fourth elements of the

prima facie case for Zarling's age discrimination claim, nor is there any dispute

regarding Zarling's marital status.  Zarling was over 40 years old and married

during the period when the events leading to this litigation took place, Abbott

does not contend that Zarling was unqualified for his position, and the sales

representative who took over some of Zarling's accounts, Bosanquet, was

unmarried and in his thirties.

Abbott argues, however, that Zarling cannot establish a prima facie case of

age or marital status discrimination because Zarling was not subjected to an

"adverse employment action."  Abbott contends that it merely accepted Zarling's

resignation and did not terminate his employment involuntarily.  See

Featherstone v. Southern Cal. Permanente Med. Grp., 10 Cal. App. 5th 1150,

1163-64 (2017) ("an employee cannot voluntarily submit a resignation and then claim the employer's acceptance of the resignation is an adverse employment action"). To support this argument, Abbott relies on the fact that Zarling discussed retirement and a release from his employment contract in various emails and other communications from 2018 to 2020. (See, e.g., Doc. 97-1, Ex. B; Ex. V; Ex. I.)

Abbott's contention that it merely accepted Zarling's resignation in April 2020 is specious. It is true that Zarling discussed retirement on several occasions from 2018 to 2020, but Abbott would not agree to the terms Zarling desired, including a guaranteed salary through the end of 2020 and a severance package. Further, Zarling made it clear in writing on multiple occasions that he was not resigning. (Doc. 97-1, Ex. CC; Ex. HH ("I want to make it clear that I did not resign.").) Thus, Abbott subjected Zarling to an "adverse employment action" when it terminated his employment in April 2020. The question is whether it did so based on a discriminatory motive.

Beyond his eventual termination, Zarling alleges Abbott took other adverse employment actions against him. He argues that the reassignment of 60% to 70% of his sales accounts in early 2019 was one such action. Zarling also

alleges that Stewart's "intimidation and aggressive behavior" in 2019, including the picture message he sent Zarling after Zarling complained about the baggage comment, and the negative performance evaluations Stewart prepared about Zarling, all constitute adverse employment actions as well. Abbott contends these acts cannot serve as adverse employment actions because they did not "materially affect[] the terms, conditions, or privileges" of Zarling's employment. McRae v. Dep't of Corr. & Rehab., 142 Cal. App. 4th 377, 386 (2006) (stating criteria for adverse employment actions under California law).

However, the Court need not resolve the issue of whether these other actions can serve as adverse employment actions to resolve Abbott's motion as to Counts 1 and 2 because, as explained further below, the Court finds that Zarling has failed to present sufficient evidence that Abbott took any actions that may qualify as adverse employment actions, including terminating Zarling's employment, based on discriminatory motives. Further, for the purpose of establishing Zarling's prima facie case, there is no dispute that termination of employment may serve as an adverse employment action. Therefore, Zarling has made out a prima facie case on his age and marital status discrimination claims.

For the second step of the <u>McDonnell Douglas</u> analysis, Abbott argues it has at least two legitimate, non-discriminatory reasons for ending Zarling's employment. First, Abbott argues it simply accepted Zarling's resignation. As noted above, this argument is not supported by the record.

Second, Abbott argues that continuing Zarling's employment was inconsistent with the long-term business plans Abbott had developed in reliance on Zarling's repeated statements that he intended to transition his accounts to other team members and retire within the next few years. (<u>See, e.g.</u>, Doc. 97-1, Ex. B; Ex. V; Ex. I.) Indeed, Abbott had already begun transitioning Zarling's accounts to other team members with Zarling's consent and had been paying Zarling a guaranteed salary in 2019 so that he could mentor other team members and prepare for his retirement. Zarling may have gone back and forth on his preferred retirement date and terms throughout 2019 and early 2020, but Abbott was not obligated to accept Zarling's preferred succession plan. Once Zarling became an at-will employee in April 2020 and Abbott determined that his continued employment with a substantial guaranteed salary was no longer consistent with its long-term business plans, Abbott was free to terminate Zarling as long as it did not do so based on discriminatory motives.

Because Abbott has supplied a legitimate, non-discriminatory reason for terminating Zarling's employment, the burden shifts back to Zarling at the third step of the <u>McDonnell Douglas</u> framework and requires him to show that Abbott's reason was pretextual.  Zarling's burden to prove pretext "requires more substantial evidence than it takes to make a prima facie case and evidence of pretext . . . is viewed in light of the employer's justification."  <u>King v. Guardian ad Litem Bd.</u>, 39 F.4th 979, 987 (8th Cir. 2022) (cleaned up).  Zarling "must produce 'specific' and 'substantial' facts to create a triable issue of pretext." <u>Wiele v. Delaware N. Companies, Inc.</u>, No. 2:21-CV-07271-SB-AS, 2022 WL 714392, at *5 (C.D. Cal. Mar. 4, 2022); <u>Rahlf v. Mo-Tech Corp.</u>, 642 F.3d 633, 638 (8th Cir. 2011) ("When an employer articulates a nondiscriminatory reason for an employee's discharge . . . the factual inquiry proceeds to a new level of specificity.") (internal citations and quotations omitted).

To attempt to show pretext, Zarling primarily relies on Stewart's comments during the March 29, 2019 meeting.  Zarling alleges that at this meeting Stewart evinced discriminatory animus by stating that Bosanquet would be a good candidate to take over some of Zarling's accounts because he had no "baggage."  Zarling further alleges that Stewart explained that he meant

Bosanquet did not have a spouse or children and could, therefore, entertain clients more frequently.  Zarling also alleges that Stewart said the word "younger" at some point during this meeting but admits he cannot recall the context in which Stewart used this word.

Under both the ADEA and Cal. Gov. Code § 12940(a), "stray remarks" by fellow employees, on their own, are not sufficient to create a triable issue on an age or marital status discrimination claim.  See, e.g., Fitzgerald v. Action, Inc., 521 F.3d 867, 876 (8th Cir. 2008) ("'Stray remarks' standing alone do not give rise to an inference of discrimination.") (citation omitted); Nesbit v. Pepisco, Inc., 994 F.2d 703, 705 (9th Cir. 1993) (comment that "[w]e don't necessarily like grey hair" did not support reasonable inference of discriminatory motive); Reid v. Google, Inc., 50 Cal. 4th 512, 541 (2010) ("A stray remark alone may not create a triable issue of age discrimination.").

The Supreme Court of California explained the rationale behind precedents like these "stray remark" cases in Guz v. Bechtel National, Inc.:

> the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a

> whole is insufficient to permit a rational inference that the
> employer's actual motive was discriminatory.

24 Cal. 4th 317, 361 (2000).

Where the employee who made the stray remark is not responsible for the

adverse employment action, it becomes even more difficult for the plaintiff to

rely on a stray remark to show discriminatory motive.  See O'Connor v. City of

El Segundo, No. CV 20-311-DMG (PLAX), 2021 WL 5000679, at *11 (C.D. Cal. Jan.

19, 2021) ("solitary comment by a non-decision-maker, without more, is

insufficient to create a suggestion of a discriminatory motive").  Further, the

timing of an allegedly discriminatory remark is relevant; a remark that is

"remote in time" from an adverse employment action does "not support a

finding of pretext for intentional discrimination."  Bauer v. Metz Baking Co., 59

F. Supp. 2d 896, 909 (N.D. Iowa 1999).

Zarling's evidence of discriminatory motive falls short of creating a triable

issue as to pretext under the authorities discussed above.  The fact that Zarling

has disproved one of Abbott's proffered reasons for ending Zarling's

employment, i.e., that Abbott merely accepted his resignation, does weigh in

favor of a finding of pretext.  See Guz, 24 Cal. 4th at 363 (noting that an inference

of pretext "may arise where the employer has given . . . factually baseless

justifications for its actions").  But simply disproving Abbott's allegation that Zarling voluntarily resigned is not sufficient to create a triable issue concerning pretext based on the record before the Court.  Id. at 360-61 ("an inference of intentional discrimination cannot be drawn solely from evidence, if any, that the company lied about its reasons").

There is no evidence in the record to permit a rational inference that Abbott terminated Zarling or took any of the other qualifying adverse actions he alleges based on discriminatory motives.  Zarling had mentioned the possibility of retiring in the near term on several occasions from 2018 to 2020.  He even agreed to take on a mentoring role with a guaranteed salary in exchange for transitioning most of his accounts to other team members in 2019.  Zarling does not contend that this arrangement was meant to be temporary; it was an obvious segue to his eventual retirement.  Indeed, Zarling was actively negotiating a final separation agreement around the time that Abbott terminated him in April 2020. The only dispute between the parties appears to be whether Zarling had expressed his intention to retire at the end of 2019 or the end of 2020.

In contrast to this record, Zarling relies on exceedingly thin evidence to try to show that Abbott was acting out of animus related to his age or marital status

when it terminated him.  He primarily relies on one conversation that took place

a full year before he was terminated, the March 29, 2019 meeting with Stewart

and Teplitsky.  Zarling admits he cannot recall the context of the only age-related

term used during that meeting— "younger"—which means this allegation

cannot serve as evidence of discriminatory motive at all.  See Wiele, 2022 WL

714392, at *5 (evidence of pretext must be "specific"); Rahlf, 642 F.3d at 638

(same).  This is sufficient to dispose of Zarling's age discrimination claim.

Zarling also cannot rely on Stewart's "baggage" comment to support a

rational inference that Abbott discriminated against him based on his marital

status.  Zarling admits he cannot recall any other allegedly discriminatory

comments from his time at Abbott about his marital status or otherwise, which

demonstrates that this comment was a "stray" remark.  See, e.g., Fitzgerald, 521

F.3d at 876.  Stewart was not the decision-maker responsible for Zarling's

eventual termination.  See O'Connor, 2021 WL 5000679, at *11.  Stewart's

comment was "remote in time" from Zarling's termination a year later in April

2020.  Bauer, 59 F. Supp. 2d at 909.  Further, Zarling's termination came

immediately after several discussions with his superiors during which the parties

failed to reach consensus on terms for Zarling's mutually-anticipated resignation.

Based on this record, the Court finds that Zarling has failed to present sufficient evidence to create a triable issue as to pretext.  Accordingly, the Court will grant summary judgment to Abbott dismissing Zarling's age and marital status discrimination claims.

### 3.    Zarling's Retaliation Claims

Abbott also moves for summary judgment dismissing Zarling's retaliation claims, which are brought under both state and federal law.  Zarling alleges that Abbott terminated his employment and took other adverse actions against him because he complained to Teplitsky on April 5, 2019 about Stewart's comments from the March 29, 2019 meeting.

To establish a retaliation claim under the ADEA, a plaintiff must satisfy three elements: (1) he engaged in statutorily protected activity; (2) an adverse employment action; and (3) a causal connection between the two.  Heisler v. Nationwide Mut. Ins. Co., 931 F.3d 786, 794 (8th Cir. 2019) (citations omitted).

Zarling cannot establish the first element of his ADEA retaliation claim because the only potentially actionable comment under the ADEA that he reported to Teplitsky, Stewart's baggage comment, did not reference age.  Again, Zarling cannot rely on his allegation that Stewart may have used the word

31

"younger" during the March 29, 2019 meeting because this allegation is too vague.  Zarling's ADEA retaliation claim thus fails for this reason.

However, Zarling also argues that his retaliation claim is based on the fact that he disclosed a "reasonably based suspicion" of marital status discrimination by complaining about Stewart's baggage comment to Teplitsky.  California Labor Code § 1102.5 prohibits an employer from taking adverse employment actions against an employee because the "employee discloses 'reasonably based suspicions' of illegal activity."  Ross v. Cnty. of Riverside, 36 Cal. App. 5th 580, 592 (2019).

The Supreme Court of California recently clarified that retaliation claims brought under § 1102.5 do not utilize the traditional McDonnell Douglas burden-shifting framework.  Rather, the court held that the relevant inquiry is whether a plaintiff has shown that unlawful retaliation was a "contributing factor" in an adverse employment action.  Lawson v. PPG Architectural Finishes, Inc., 12 Cal. 5th 703, 718 (2022); Cal. Lab. Code § 1102.6.  Once a plaintiff makes this showing, "the burden shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate,

independent reasons even had the plaintiff not engaged in protected activity."

Id. at 718.

Zarling alleges that his report to Teplitsky is causally related to a number of adverse employment actions, including his termination and "the [Denzel Washington] text, intimidation and aggressive behavior, a deteriorating relationship and lack of communication and management, 'poisoning the well' with Teplitsky, the performance case against Zarling, and the false performance assessment." (Doc. 113 at 34.) Apart from his termination, none of these actions can serve as adverse employment actions in the context of this case.

California law defines an "adverse employment action" similarly to federal law as an action that "materially affects the terms, conditions, or privileges of employment." Doe v. Dep't of Corr. & Rehab., 43 Cal. App. 5th 721, 734 (2019); McRae, 142 Cal. App. 4th at 386. Zarling does not explain how any of the adverse actions he alleges "materially affected the terms, conditions, or privileges" of his employment at Abbott. (See Doc. 113 at 34.) For example, there is no evidence that Hallisey relied on Zarling's performance assessments as the justification for terminating Zarling's employment in April 2020. See Akers v. Cnty. of San Diego, 95 Cal. App. 4th 1441, 1457 (2002) (noting that negative

performance evaluations "are inadequate to support a retaliation claim" unless

employee shows "employer wrongfully uses the negative evaluation to

substantially and materially change the terms and conditions of employment").

Overall, Zarling's allegations as to these other adverse actions are either too

vague or unsupported by citation to record evidence, or both, to withstand

summary judgment.  See Qu v. Bd. of Regents of Univ. of Minnesota, No. CIV.

08-1843 RHK/JSM, 2009 WL 2900334, at *9 (D. Minn. Sept. 2, 2009) (dismissing

retaliation claims on summary judgment because they were too vague and

unsupported, among other reasons).

Zarling has also failed to present sufficient evidence to raise a triable issue

over whether this complaint was a "contributing factor" in his termination under

California law.  As a threshold matter, Zarling has not produced evidence

demonstrating that Teplitsky even told Stewart about the complaint.  Zayed v.

Associated Bank, N.A., 913 F.3d 709, 716 (8th Cir. 2019) (affirming grant of

summary judgment where party's theory required "resorting to speculation and

conjecture") (citation omitted).

Even if Teplitsky did tell Stewart about the complaint, Zarling fails to

show how this complaint could serve as a contributing factor in his termination

given that neither Stewart nor Teplitsky were responsible for the decision to terminate Zarling a year later in April 2020.  Indeed, Teplitsky had resigned from Abbott months before Zarling was terminated.  Again, Zarling was terminated after months of unsuccessful negotiations over the terms of his resignation and after his employment contract expired, making him an at-will employee.  Zarling cites no evidence that this lone complaint to Teplitsky from a year earlier was ever brought up during these negotiations.

On this record, Zarling's California retaliation claim fails at the first step of the two-step process outlined in <u>Lawson</u> because he has failed to create a triable issue over whether a report of unlawful age or marital status discrimination "contributed to" Abbott's decision to terminate him.  12 Cal. 5th at 718.

### 4.    Breach of Contract

The Court previously denied Abbott's Motion to Dismiss Zarling's breach of contract claim.  (Doc. 59 at 19.)  Zarling's breach of contract claim is governed by Minnesota law under the 2019 TOY employment contract's choice of law provision.  (Doc. 97-1, Ex. M ¶ 5.)  Under Minnesota law, "[t]he elements of a breach of contract claim are (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the

defendant, and (3) breach of the contract by defendant." Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co., 848 N.W.2d 539, 543 (Minn. 2014) (citation omitted). The parties dispute whether Zarling can satisfy the second and third elements of his contract claim.

Zarling's 2019 TOY employment contract required Abbott to pay him severance if it terminated his employment before April 1, 2020 due to a "position elimination or a reduction in force," and then only if Zarling also signed "a separation and release agreement." (Doc. 97-1, Ex. M ¶¶ 2(A)(iii), 3(B).) Abbott argues that neither condition precedent was fulfilled and, therefore, it did not breach the TOY employment contract by refusing to pay Zarling severance.

Zarling argues that summary judgment on this claim is inappropriate because Abbott eliminated his position on January 1, 2020, which was three months before the expiration of his 2019 TOY employment contract. In support of this argument, Zarling points out that when he returned from vacation in January 2020, he found that all of his sales accounts had been reassigned and he had no one left to manage. Zarling cites testimony from Hallisey, Provost, and Percy who agreed that Zarling would no longer qualify as a territory manager or a sales representative if he had no sales accounts and no one to manage. Zarling

argues the lack of a title change is irrelevant, Abbott effectively eliminated his position in January 2020.

Abbott counters that Zarling's argument fails for at least two reasons. First, in January 2020, Zarling was negotiating a mutual release from the 2019 TOY employment contract and the contract did not provide for severance if Zarling voluntarily resigned.  The contract only required severance where Zarling was terminated due to a "position elimination or a reduction in force." (Doc. 97-1, Ex. M ¶¶ 2(A)(iii), 3(B).)  Second, Abbott argues that, even if it eliminated Zarling's position, the contract required Zarling to sign a separation agreement before he could receive severance.  (Id.)  There is no dispute that Zarling refused to sign the separation agreement Abbott proposed.  According to Abbott, both arguments show that Zarling did not satisfy the conditions precedent necessary to support his contract claim.

Under Minnesota law, "[i]f a party to a contract unjustifiably prevents the occurrence of a condition precedent, then that party's duty to perform is not excused."  Minnwest Bank Cent. v. Flagship Properties LLC, 689 N.W.2d 295, 300 (Minn. Ct. App. 2004) (citing In re Hennepin County 1986 Recycling Bond Litigation, 540 N.W.2d 494, 502-03 (Minn. 1995)).

As before, the Court finds that there are triable issues that preclude the dismissal of Zarling's contract claim, including whether Zarling's failure to fulfil the conditions precedent to recovery is excused because Abbott unjustifiably hindered Zarling's ability to fulfil those conditions.  Based on the record before the Court, a reasonable jury could find that Zarling only requested a mutual separation because Abbott had already eliminated his position.  Further, a reasonable jury could find that Abbott unjustifiably hindered Zarling's ability to sign a separation agreement by only providing an agreement that waived Zarling's right to severance.  (Doc. 97-1, Ex. AA.)  Based on the foregoing, the Court will deny Abbott's Motion for Summary Judgment on Zarling's breach of contract claim.

### 5.    Defamation

Zarling asserts a defamation claim against Abbott based on statements contained in two sources: (1) a January 16, 2020 call between Hofstadter and Provost; and (2) the 2019 Performance Assessment Stewart prepared about Zarling.

Zarling argued in his briefing that another document, Stewart's "Report on John Zarling," also contained defamatory statements.  At oral argument,

however, Zarling's counsel clarified that Zarling is not asserting a defamation

claim based on this Report.  Rather, Zarling merely seeks to introduce this Report

to provide additional "context" to support his claim, which is only based on the

Performance Assessment and the statements Provost made to Hofstadter.  In any

event, Zarling cannot assert a defamation claim based on the Report because it is

not pled in his operative pleading, the First Amended Complaint.  Sherr v.

HealthEast Care Sys., 999 F.3d 589, 597 (8th Cir. 2021) ("Under Minnesota law,

defamation claims must be pleaded with 'a certain degree of specificity . . . [a]ny

statements not so identified in the complaint are beyond the scope of a plaintiff's

defamation claim.") (citations and internal quotations omitted).  Whether or not

the Report is admissible for some other purpose such as "context" is an issue the

Court may resolve at the time of trial.

Zarling has not challenged Abbott's assertion that Minnesota law applies

to his defamation claim.  Under Minnesota law, a plaintiff alleging defamation

must prove that the defendant made (1) a false and defamatory statement about

the plaintiff, (2) published to a third party, that (3) harmed the plaintiff's

reputation.  Maethner v. Someplace Safe, Inc., 929 N.W.2d 868, 873 (Minn. 2019).

Zarling has sufficiently satisfied the second and third elements of his

defamation claim for this claim to withstand summary judgment.  For

publication, Zarling presents evidence in the form of emails and deposition

testimony showing that the allegedly defamatory statements were shared with

various other Abbott employees.  (Doc. 116, Ex. 6 at 106:9-17; Ex. 9 at 150:9-15;

Ex. 19.)  "Minnesota law recognizes that communications between employees of

a corporation can constitute defamatory publication."  Krutchen v. Zayo

Bandwidth Ne., LLC, 591 F. Supp. 2d 1002, 1020 (D. Minn. 2008) (citing Frankson

v. Design Space Int'l, 394 N.W.2d 140, 143 (Minn. 1986)).

For the third element, damage to reputation, a party asserting a

defamation claim under Minnesota law must ordinarily present non-speculative

evidence of damages to survive summary judgment.  However, "[i]f the

defamation affects the plaintiff in his business, trade, profession, office or calling,

it is defamation per se and thus actionable without any proof of actual damages."

Bahr v. Boise Cascade Corp., 766 N.W.2d 910, 920 (Minn. 2009) (cleaned up).

"Courts allow presumed damages because statements that are defamatory per se

are 'virtually certain to cause serious injury to reputation, and . . . this kind of

injury is extremely difficult to prove.'"  Maethner, 929 N.W.2d at 875 (quoting

Carey v. Piphus, 435 U.S. 247, 262 (1978)).  All of the allegedly defamatory

statements at issue relate to Zarling's profession as a sales representative and

Territory Manager for Abbott and may, thus, constitute defamation per se.

Accordingly, Zarling may proceed to trial without consideration at this

procedural stage of whether he has presented proof of damages.  Bahr, 766

N.W.2d at 920; Maethner, 929 N.W.2d at 875.

 As for the first element of his claim, a plaintiff cannot show that a

statement was "defamatory" as a matter of law if the allegedly defamatory

statements are "expressions of opinion not sufficiently factual to be susceptible of

being proved true or false."  Hunter v. Hartman, 545 N.W.2d 699, 706 (Minn. Ct.

App. 1996) (quotation omitted); see also Gacek v. Owens & Minor Distribution,

Inc., 666 F.3d 1142, 1147 (8th Cir. 2012) (quoting Schlieman v. Gannett Minn.

Broad., Inc., 637 N.W.2d 297, 308 (Minn. Ct. App. 2001) ("if it is plain that the

speaker is expressing a subjective view, an interpretation, a theory, conjecture, or

surmise, rather than claiming to be in possession of objectively verifiable facts,

the statement is not actionable")).  Defamation claims based on pure statements

of opinion fail because "[i]t is well-recognized in Minnesota that the First

Amendment absolutely protects opinion that lacks 'a provably false statement of

41

fact.'" McClure v. Am. Fam. Mut. Ins. Co., 223 F.3d 845, 853 (8th Cir. 2000)

(quoting Hunter, 545 N.W.2d at 706).

Courts applying Minnesota law examine four factors to determine if

statements are too opinion-like to be actionable as defamation. Id. Those factors

include the "'(1) specificity and precision of the statement; (2) verifiability; (3)

literary and social context in which it was made, and (4) public context.'" Id.

(quoting Geraci v. Eckankar, 526 N.W.2d 391, 397 (Minn. App. 1995)).

Even if a plaintiff satisfies all three elements of a defamation claim

however, a "qualified privilege" may still defeat the claim as a matter of law. Bol

v. Cole, 561 N.W.2d 143, 149 (Minn. 1997). The Minnesota Supreme Court has

explained the circumstances under which this qualified privilege applies:

> Qualified privilege applies when a court determines that statements
> made in particular contexts or on certain occasions should be
> encouraged despite the risk that the statements might be
> defamatory. For a defamatory statement to be protected by a
> qualified privilege, the statement must be made in good faith and
> must be made upon a proper occasion, from a proper motive, and
> must be based upon reasonable or probable cause.

Id. (citations omitted and cleaned up). "Whether a qualified privilege exists is a

question of law for the court to decide." Id.

Even where a qualified privilege applies, a plaintiff may still succeed on a defamation claim by demonstrating that the defendant abused the privilege by making the statements at issue with "malice."  <u>Maethner</u>, 929 N.W.2d at 873.  In cases that do not involve public figures or matters of public concern, such as this one, the common law definition of malice applies.  <u>See</u> <u>id.</u> (noting that "it is important to distinguish between 'actual malice' and 'common law malice'") (quoting <u>Moreno v. Crookston Times Printing Co.</u>, 610 N.W.2d 321, 329 (Minn. 2000)).  "Malice under the common law means that the defendant made the statement 'from ill will and improper motives, or causelessly and wantonly for the purpose of injuring the plaintiff.'"  <u>Id.</u> (quoting <u>Stuempges v. Parke, Davis & Co.</u>, 297 N.W.2d 252, 257 (Minn. 1980)).

### a.   Provost's Statements to Hofstadter During Their January 16, 2020 Call

Abbott argues that Zarling's defamation claim based on Provost's statements must fail because this claim is based on inadmissible hearsay. "Hearsay evidence alone is insufficient to defeat summary judgment."  <u>Dull v. St. Luke's Hosp. of Duluth</u>, 21 F. Supp. 2d 1022, 1028 (D. Minn. 1998) (citing <u>Firemen's Fund Ins. Co. v. Thien</u>, 8 F.3d 1307, 1310 (8th Cir.1993)).

Abbott's hearsay argument fails, however, because Zarling's claim that

Provost made defamatory remarks about him during the call with Hofstadter is

supported by a declaration from Hofstadter attesting to the statements Provost

allegedly made.  (Doc. 116, Ex. 33.)  Hofstadter's Declaration provides adequate

foundation at this stage to show that Provost's statements were a statement of an

opposing party (Abbott), which are admissible under Federal Rule of Evidence

801(d)(2).

Next, Abbott argues that Provost's alleged statements are too opinion-like

to be actionable as defamation because they are incapable of being proven true or

false.  In his Declaration, Hofstadter makes the following allegations about

Provost's statements on the call:

> I spoke with Joe Provost on January 16, 2020, and he told me that
> John Zarling was not a nice guy, had missed patient clinics, refused
> to return phone calls, numerous doctors wanted to see more of him
> but he refused to meet with them, he was a bad teammate, and Todd
> Stewart had made great sacrifices for him but he was not
> appreciative.

(Doc. 116, Ex. 33 ¶ 3.)

Abbott's argument fails under the four-factor test described above.

McClure, 223 F.3d at 853.  Provost's statements that Zarling was "not a nice guy"

and a "bad teammate" are non-actionable opinion statements.  (Doc. 116, Ex. 33 ¶

44

3.)  But the alleged statements that Zarling had missed patient clinics, did not return phone calls, and that Zarling had refused to meet with doctors are specific and verifiable enough to support a defamation claim.  Id.

The Court's analysis of this call does not end here, however, because Abbott also argues that Provost's statements are protected by qualified privilege. Minnesota courts have generally found that an employer's statements about an employee's work performance are entitled to a qualified privilege when they are made within the workplace because such statements satisfy the "proper occasion" and "proper purpose" requirements for this privilege to apply.  See, e.g., Kletschka v. Abbott-Nw. Hosp., Inc., 417 N.W.2d 752, 755 (Minn. Ct. App. 1988); Walker v. Wanner Eng'g, Inc., 867 F. Supp. 2d 1050, 1054 (D. Minn. 2012). The qualified privilege does not apply however, where an employer publishes statements about an employee's performance without "reasonable or probable grounds for believing in the validity of the statement."  Wirig v. Kinney Shoe. Corp., 461 N.W.2d 374, 381 (Minn. 1990).  For example, "[a]n employer lacks probable or reasonable grounds for making a defamatory statement if that employer has failed to investigate and instead relied only on other potentially

biased employees' statements or hearsay from unidentified sources." Walker, 867 F. Supp. 2d at 1054.

Abbott argues that Provost had a reasonable basis to tell Hofstadter that Zarling's performance at work was suffering because Provost heard these statements from at least two trusted employees, Stewart and Teplitsky.  Zarling does not provide any evidence to show Provost had reason to believe Stewart and Teplitsky were lying to him about Zarling's performance.  Instead, Zarling goes so far as to admit that "Provost trusted what Stewart and Teplitsky told him about Zarling."  (Doc. 113 at 14.)  In the context of Hofstadter initiating this call on behalf of Zarling with Zarling's consent to discuss Zarling's challenges at work, Provost had a reasonable basis to repeat Stewart and Teplitsky's observations to Hofstadter.  This is not a situation like in Wirig where a supervisor accused an employee of theft in front of a group of employees based on reports from obviously-biased employees with whom the supervisor had "only perfunctory personal acquaintance."  461 N.W.2d at 380.  Accordingly, the Court finds that the qualified privilege applies to Provost's statements and, therefore, Zarling must provide evidence that Provost made the statements with malice.

Zarling, however, does not argue that Provost made the statements with malice, let alone provide evidence to support such an allegation.  In fact, Zarling claims that "Stewart was the perpetrator behind all of the defamatory statements," implying that Provost was simply repeating what he heard from a trusted source.  (Doc. 113 at 25 (emphasis added).)  Without any evidence of malice, Zarling's defamation claim based on the call between Provost and Hofstadter must fail.  Accordingly, the Court will grant summary judgment to Abbott dismissing this portion of Zarling's defamation claim.

**b.    The 2019 Performance Assessment**

Abbott similarly argues that the Court should grant summary judgment dismissing the portion of Zarling's defamation claim premised on Stewart's 2019 Performance Assessment.

Abbott again argues that the statements in the Performance Assessment are non-actionable opinion statements under the four-factor test described above. McClure, 223 F.3d at 853.  Specific to the Performance Assessment, Abbott argues that Stewart's statements in this document are protected as subjective opinions based on Stewart's own observations of Zarling's performance.  Abbott cites a

host of cases where courts found statements too vague or opinion-like to be actionable.  (Doc. 95 at 26–27.)

Abbott's opinion argument fails again, however, because at least some of the statements contained in the Performance Assessment are sufficiently precise and verifiable to support a defamation claim.  For example, in the Performance Assessment, Stewart claimed that Zarling "did not achieve expectations in Sales Revenue Performance."  But Zarling argues that his decreased sales revenue in 2019 stemmed from a variety of factors that were known to Stewart, including the fact that Abbott had reassigned the majority of Zarling's sales accounts, that a clinic at one of his remaining accounts had closed, that a primary physician client had moved away, and that Abbott had cut its prices.  (See Doc. 116, Ex. 1 at 125:9-126:5, 146:25-147:19; Ex. 36.)  Moreover, Zarling alleges that his sales had actually increased at one of his few remaining accounts.  (Id., Ex. 1 at 126:1-5.)

Further, Zarling received very positive performance assessments in 2017 and 2018 and was even recognized as one of Abbott's top performing sales representatives in 2018.  (Doc. 116, Ex. 7; Ex. 22; Ex. 23.)  This record presents sufficient evidence to create a triable issue as to whether Stewart's statement regarding Zarling's sales performance was verifiably false, especially given the

context Stewart failed to include with this statement.  See Schlieman, 637 N.W.2d

at 304 ("Context is critical to meaning because a false statement that is

defamatory on its face may not be defamatory when read in context, and a

statement that is not defamatory on its face may, in fact, be defamatory when

read in context.").

Regarding Stewart's allegation that Zarling was not meeting with doctors,

multiple doctors whom Zarling served submitted declarations contradicting this

allegation as to their practices.  (Doc. 116, Ex. 36; Ex. 37; Ex. 38.)  Zarling also

alleges that Stewart's statement that he failed to use a shared calendar or alert his

coworkers when he took vacations also leaves out important context because

Zarling claims he always told his coworkers about his whereabouts through

emails and text messages.  (Id., Ex. 1 at 96:13-97:24, 138:13-25); Schlieman, 637

N.W.2d at 304.

Indeed, Zarling has provided the Court with numerous emails, letters, and

declarations from current and former Abbott employees, former clients, and

more who all attest to Zarling being a consistently attentive and competent sales

representative, manager, and co-worker.  (Doc. 116, Exs. 27, 34-50.)  Viewing the

evidence in the context of these numerous evidentiary submissions, the

Performance Assessment contains statements that are sufficiently factual and verifiable to support a defamation claim.  McClure, 223 F.3d at 853.

As before, however, the Court also finds that the statements in the Performance Assessment are entitled to the qualified privilege, which means Zarling will need to prove Stewart made these statements with malice at trial.  As noted above, the qualified privilege generally applies to an employer's statements about an employee's work performance when the employer demonstrates that it had reasonable grounds to make the statements.  Wirig, 461 N.W.2d at 381; Walker, 867 F. Supp. 2d at 1054; Kletschka, 417 N.W.2d at 755. Here, the record demonstrates that Stewart was Zarling's direct supervisor for at least a portion of 2019 and worked closely enough with Zarling to personally observe his work.  This close working relationship between a supervisor and a subordinate provided Stewart with reasonable grounds to provide an assessment of Stewart's work performance.  Accordingly, Stewart's statements are protected by the qualified privilege.

"Courts have generally held that whether the privilege has been abused because the communicating party acted with malice is a question for the jury." Krutchen v. Zayo Bandwidth Ne., LLC, 591 F. Supp. 2d 1002, 1020 (D. Minn.

2008) (citations omitted).  Viewing the evidence in the light most favorable to

Zarling, there is a triable issue as to whether Stewart abused the privilege by

making false statements about Zarling's performance for the purpose of pushing

Zarling to resign earlier than Zarling wanted.  If proven, such an action by

Stewart could constitute malice.  <u>Elstrom v. Indep. Sch. Dist. No. 270</u>, 533 N.W.2d

51, 55 (Minn. Ct. App. 1995) (citing <u>Stuempgues</u>, 297 N.W.2d at 257) (noting that

malice may be shown where declarant made statements "with ill will or for

purposes of harming" another individual).

Based on the foregoing, the Court will deny Abbott's Motion as it relates to

Zarling's defamation claim premised on the 2019 Performance Assessment.

**B.    Abbott's <u>Daubert</u> Motion**

**1.    Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993)**

Rule 702 of the Federal Rules of Evidence provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and
methods; and

(d) the expert has reliably applied the principles and methods
to the facts of the case.

The role of trial courts is to serve as "gatekeepers" to ensure that "'the

proffered expert testimony is both relevant and reliable.'"  Wagner v. Hesston

Corp., 450 F.3d 756, 758 (8th Cir. 2006) (quoting Anderson v. Raymond Corp., 340

F.3d 520, 523 (8th Cir. 2003)).  In this role, "the law grants the trial judge broad

latitude" to determine the reliability of expert evidence.  Kumho Tire Co., Ltd. v.

Carmichael, 526 U.S. 137, 153 (1999).

In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court

provided some general observations for the lower courts to consider in making

determinations as to whether an expert's testimony is relevant and reliable.  509

U.S. 579, 592-95 (1993).  These factors include the following:

(1) whether the theory or technique can be or has been tested; (2)
whether the theory or technique has been subjected to peer review
or publication; (3) whether the theory or technique has a known or
potential error rate and standards controlling the technique's
operation; and (4) whether the theory or technique is generally
accepted in the scientific community.

Russell v. Whirlpool Corp., 702 F.3d 450, 456 (8th Cir. 2012) (citing Daubert, 509

U.S. at 593-94).  In Kumho Tire Company, Ltd. v. Carmichael, the Supreme Court

extended Daubert's holding to non-scientist experts who rely on "technical" or

"specialized knowledge."  526 U.S. at 149 (1999) (quoting Daubert, 509 U.S. at

590-92)).

   When addressing the reliability factor, the Supreme Court has also held

that "nothing in either Daubert or the Federal Rules of Evidence requires a

district court to admit opinion evidence that is connected to existing data only by

the ipse dixit of the expert.  A court may conclude that there is simply too great

an analytical gap between the data and the opinion proffered."  Gen. Elec. Co. v.

Joiner, 522 U.S. 136, 146 (1997).

   Challenges to the factual basis of expert testimony, however, go "to the

credibility of the testimony, not the admissibility, and it is up to the opposing

party to examine the factual basis for the opinion in cross-examination.  Only if

the expert's opinion is so fundamentally unsupported that it can offer no

assistance to the jury must such testimony be excluded."  Bonner v. ISP Tech,

Inc., 259 F. 3d 924, 929-30 (8th Cir. 2001) (quoting Hose v. Chicago Northwestern

Transp. Co., 70 F. 3d 968, 974 (8th Cir. 1996)).

The party offering expert testimony has the burden of establishing its

admissibility under Rule 702 by a preponderance of the evidence.  Polski v.

Quigley Corp., 538 F.3d 836, 841 (8th Cir. 2008) (citing Marmo v. Tyson Fresh

Meats, Inc., 457 F.3d 748, 757-58 (8th Cir.2006)).

### 2. Abbott's Motion to Exclude Stan V. Smith's Report and Related Testimony Regarding "Hedonic Damages"

Abbott moves to exclude the report and testimony of Plaintiff's expert,

Stan V. Smith, Ph.D., related to "hedonic" or "loss of the value of enjoyment of

life" damages.  (Doc. 87.)  Smith calculates Zarling's hedonic damages as a result

of Abbott's alleged actions as falling between $313,231 and $585,896, averaging

$449,564.  (Doc. 90-1, Ex. E, Smith Rep. at 10.)

Smith calculates this figure using a methodology he has developed using

various studies that measure the value of a human life.  (Doc. 90-1, Ex. E at 8-9.)

These studies generally measure the value of a life using a "willingness-to-pay"

model that measures the amount individuals are willing to pay to protect their

lives through, for instance, purchases of safety equipment and also by measuring

the premium individuals are willing to accept to perform risky jobs.  (Id.)  Smith

then relies on "meta-analyses" of these studies, which essentially average the

values from many different studies.  (Id. at 16-18.)  Smith also relied on an

interview by one of his associates, who asked Zarling to self-report the
percentage reduction in his enjoyment of life as a result of Abbott's actions.
(Doc. 90-1, Ex. A at 38:10-16; Ex. F at 10.)  Zarling reported a 30% to 50%
reduction in his enjoyment of life due to Abbott's actions, which Smith then
applied to his average value of a life, along with a few other minor adjustments,
to arrive at his hedonic damages figure of $449,564.  (Id.; see also id., Ex. E at 10,
16.)

The Court largely agrees with the reasoning of the numerous courts that
have found Smith's hedonic damages analysis inadmissible under Rule 702 and
Daubert.  See, e.g., Smith v. Jenkins, 732 F.3d 51, 66 (1st Cir. 2013) ("The
overwhelming majority of courts have concluded that [Smith's] 'willingness-to-
pay' methodology is either unreliable or not likely to assist the jury in valuing
hedonic damages, or both."); Moe v. Grinnell Coll., 547 F. Supp. 3d 841, 847-48
(S.D. Iowa 2021) (collecting authorities rejecting Smith's testimony regarding
"hedonic damages"); Jennings v. Nash, 2020 WL 770325, at *3 (W.D. Mo. Feb. 17,
2020) ("numerous circuit and district courts have excluded Dr. Smith's testimony
on hedonic damages that were based on his 'willingness to pay' model").  In this

case, as in these others, Smith's hedonic damages analysis does not satisfy the reliability or relevance requirements of Rule 702 and <u>Daubert</u>.

The reliability factors set forth in <u>Daubert</u> and its progeny weigh against admitting Smith's testimony on hedonic damages. <u>Russell</u>, 702 F.3d at 456. First, Smith's methodology cannot be tested because it relies on Zarling's self-reported percent reduction in the value of his enjoyment of his life and not on "objective indicia." <u>Moe</u>, 547 F. Supp. 3d at 849.

Second, Zarling has not provided any evidence of peer review of the application of Smith's methodology to situations like this case that involve non-physical injuries to reputation and general mental wellbeing. <u>Id.</u> at 850; <u>see also</u> <u>Cramer v. Equifax Info. Servs.</u>, No. 4:18-CV-1078 CAS, 2019 WL 4468945, at *6 (E.D. Mo. Sept. 18, 2019) (excluding Smith's hedonic damages testimony, in part, because the plaintiff did not allege that she "suffered a physical injury or loss of life").

Third, neither Zarling nor Smith have provided the Court with evidence of a known error rate or standards governing the calculation of hedonic damages due to defamation. <u>Id.</u> Smith merely makes the conclusory statement that the

potential rate of error for the studies on which he relies is "well researched." (Doc. 90-1, Ex. E at 13.)

Fourth, Smith cites numerous studies to demonstrate that valuation of a human life is a "generally accepted" method within the field of economics. (Id. at 13-14.) But he fails to demonstrate that applying this methodology to measure the reduction in the value of an individual's enjoyment of life due to defamatory remarks is generally accepted. See Moe, 547 F. Supp. 3d at 850 ("[Smith's] materials do not demonstrate peer-reviewed use of hedonic damages calculations in cases that do not involve death or physical injury").

Further, the fact that the studies used by Smith contain a wide range of values for a human life suggests that the average value Smith chose to use is not generally accepted. See Smith v. Ingersoll–Rand Co., 214 F.3d 1235, 1245 (10th Cir. 2000) ("Troubled by the disparity of results reached in published value-of-life studies and skeptical of their underlying methodology, the federal courts which have considered expert testimony on hedonic damages in the wake of Daubert have unanimously held quantifications of such damages inadmissible."). As Abbott points out in its Motion, these studies also appear to measure the value of a life, not the value of the enjoyment of life. This takes

Smith's work even further outside the ambit of the studies he uses, which simply value a human life in general.

In addition to failing to satisfy Rule 702's reliability requirement, Smith's hedonic damages analysis also fails to satisfy the Rule's relevance requirement. Rule 702 requires that expert testimony be relevant, i.e., that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

As Abbott points out, Smith's methodology begins with the value of an average, "nameless, faceless" person's life, and not Zarling's life in particular. (Doc. 90-1, Ex. E at 10, 17); Ayers v. Robinson, 887 F. Supp. 1049, 1061 (N.D. Ill. 1995) (excluding Smith's testimony under Daubert).  By beginning his analysis in this manner, Smith's calculation demonstrates a lack of relevance to the jury's task of evaluating the amount of damages, if any, that Zarling suffered.  See Ayers, 887 F. Supp. at 1061 ("This Court's trial jury will have a very different task: It must value the life of a specific individual ([plaintiff]), the quality of whose life may have been substantially richer or poorer than the statistical mean.").  Beyond the flawed starting point of Smith's analysis, this Court shares the skepticism of other courts who have questioned the relevancy of using the

studies on which Smith relies to the task of calculating damages.  See, e.g.,

Ingersoll-Rand Co., 214 F.3d at 1245; Jenkins, 732 F.3d at 67 (collecting

authorities).

Finally, as to relevance, Zarling fails to offer any cases in which a party

proceeding on a theory of defamation per se has been permitted to provide

expert testimony at trial as to a specific pecuniary loss due to diminished value

of the enjoyment of life, whether applying Minnesota law or the law of another

state.  (See Doc. 120 at 1-5.)

In support of admitting Smith's testimony on hedonic damages, Zarling

claims that many courts have admitted his testimony in the past.  (Id. at 3.)

Zarling does not provide any analysis whatsoever for the majority of the cases he

cites and for this reason the Court finds this conclusory argument unpersuasive.

For the cases that Zarling does elaborate on in some detail, the Court finds them

to be distinguishable because they involved claims for wrongful death.  See

Johnson v. Inland Steel Co., 140 F.R.D 367, 372 (N.D. Ill. 1992); Sherrod v. Berry,

827 F.2d 195 (7th Cir. 1987).  In those cases, the courts were, therefore, tasked

with evaluating the value of a lost life, which is much closer to the original

purpose of the studies on which Smith relies.  Id.

Because Zarling has failed to satisfy his burden to show that Smith's

testimony regarding hedonic damages is both reliable and relevant, the Court

will exercise its discretion to exclude his report and testimony on this topic from

trial.

### 3.   Abbott's Motion to Exclude Smith's Rebuttal Report and Related Testimony

Abbott also moves to exclude Smith's rebuttal report and related

testimony responding to Abbott's vocational expert, Amy Koellner.  In her expert

report, Koellner provides an evaluation of Zarling's post-Abbott job search.

(Doc. 90-1, Ex. M.)  Koellner opines that Zarling's search for new employment

was deficient.  (Id., Ex. M at 10.)  In his rebuttal report, Smith opines that

Koellner's analysis was flawed and that "Zarling has put forth reasonable efforts

to secure employment and mitigate his damages since his termination by

Abbott."  (Id., Ex. J. at 2.)  Abbott argues that Smith is not qualified to provide

this rebuttal opinion and that his rebuttal report is not based on sufficient facts.

Rule 702 requires that expert witnesses be qualified to provide opinions

based on their "knowledge, skill, experience, training, or education."  Fed. R.

Evid. 702; see also Khoury v. Philips Med. Sys., 614 F.3d 888, 893 (8th Cir. 2010).

Abbott argues that Smith is not qualified to opine on the reasonableness of

Zarling's job search because he is an economist, not a vocational expert like Koellner.  But Zarling counters that Smith has a background in labor economics, has been analyzing careers for more than three decades, and has worked on many cases involving career assessments.

The Court finds that the differences between Koellner and Smith's backgrounds do not render Smith's rebuttal report "fundamentally unsupported."  In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig., 9 F.4th 768, 778 (8th Cir. 2021) (noting that "excluding an expert's opinion for being fundamentally unsupported is an exception to the general rule that gaps in an expert witness's knowledge go to weight, not admissibility") (cleaned up) (citing Robinson v. GEICO Gen. Ins., 447 F.3d 1096, 1100 (8th Cir. 2006)).  The Court will, therefore, not exclude Smith's rebuttal report on the basis of his qualifications.

Further, none of the cases Abbott cites in support of its argument about Smith's qualifications excluded his testimony on this basis.  See Smith v. Auto-Owners Ins. Co., 2017 WL 3188476, at *5 (D.N.M. July 25, 2017); Wood v. Paccar, Inc., 2020 WL4355671, at *12 (N.D. Iowa July 21, 2020); Lisdahl v. Mayo Found. for Med. Educ. & Rsch., 2009 WL 10678170, at *3 (D. Minn. Aug. 12, 2009).

The Court also finds that Smith's rebuttal report is not so devoid of a factual basis as to render it inadmissible.  Abbott takes issue with Smith's failure to independently verify Zarling's claims regarding his job search efforts and with apparent contradictions between Zarling's deposition testimony and the facts he provided to Smith.  As with any deficiencies in Smith's qualifications, however, Abbott "is free to cast doubt on these presumptions through cross examination and presentation of contrary evidence" at trial.  Auto-Owners Ins. Co., 2017 WL 3188476, at *1; Daubert, 509 U.S. at 596 (noting that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of addressing "shaky but admissible evidence.").  The Court will deny Abbott's Motion seeking to exclude Smith's rebuttal testimony addressing Koellner's opinions.

### 4.    Abbott's Motion to Exclude Jennifer Bey's Rebuttal Report and Testimony Regarding Age Discrimination

Finally, Abbott moves to exclude a portion of the report and related testimony of Jennifer Bey, who is a vocational expert Zarling retained. Specifically, Abbott seeks to preclude Bey from testifying that age discrimination may have been an impediment in Zarling's attempts to mitigate his damages by finding new employment after Abbott.  Abbott argues that Bey is not qualified to

provide an opinion regarding age discrimination, that her opinion does not have a reliable basis, and that this testimony is overly prejudicial under Federal Rule of Evidence 403.

Bey is a Certified Rehabilitation Counselor and a Certified Vocational Evaluator.  (Doc. 90-1, Ex. O at 3.)  In relevant part, Bey seeks to testify that Zarling's age has put him "at a disadvantage in his attempts to become re-employed," potentially because of an "undertone of age discrimination, or at the very least a disincentive to hire" that comes with Zarling being in his late fifties. (Id.)  Bey relied on her experience as well as interviews with two consultants familiar with the medical device industry in forming her opinion.  (Id.)

Abbott's argument that Bey is improperly attempting to opine on legal standards fails because, as Zarling points out, this argument misconstrues Bey's proposed testimony.  According to Zarling, Bey will simply provide "general observations and knowledge of older workers' difficulties in finding employment," because of, among other factors, the prevalence of age discrimination.  (Doc. 120 at 9.)  Admittedly, testimony regarding "age discrimination" carries both specific legal meaning and more commonplace meaning.  But the cases on which Abbott relies illustrate the difference between

providing general observations regarding age discrimination and an expert attempting to usurp the role of the Court by providing legal testimony. See S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003); Portz v. St. Cloud State Univ., 297 F. Supp. 3d 929, 953 (D. Minn. 2018). In Southern Pine Helicopters and Portz, the courts were concerned with experts who testified regarding the meaning of specific FAA regulations and Title IX regulations, not a commonly used phrase like "age discrimination."  Id.

Here, there is no indication that Bey's "general observation" that age discrimination may have factored into Zarling's difficulty in finding a job will cross the line into instructing the jury on the specific legal meaning of this term, as opposed to its more commonplace usage. See In re Levaquin Prod. Liab. Litig., No. MDL 08-1943 JRT, 2010 WL 8399942, at *3 (D. Minn. Nov. 4, 2010) ("Where courts have excluded such testimony, they have done so when experts have directly opined as to the law, not employed language that parallels legal language.").  Any such risk may be adequately addressed by appropriate instructions from the Court.  Id. ("If the defendants elicit testimony from [the expert] crossing the line into legal opinions, the Court can rule on an appropriate objection at that time and give a curative instruction to the jury if necessary.").

Next, Abbott argues that Bey's opinion is not supported by a sufficient factual basis.  Abbott asserts that Bey lacks familiarity with the San Francisco Bay Area's medical device industry and that the two consultants on whom she relied also lacked this industry knowledge.  The Court again finds that these arguments are appropriate matters for cross-examination that go to the weight, not the admissibility, of Bey's opinions.  In re Bair Hugger, 9 F.4th at 778.

Nor does the Court find that Bey's comments should be excluded under Rule 403, which allows the Court to exclude relevant evidence if its probative value is "substantially outweighed" by a danger of unfair prejudice.  Fed. R. Evid. 403.  Abbott argues that allowing Bey to comment on age discrimination could cause the jury to blame Abbott for age discrimination it did not commit and would result in a series of "mini-trials" over whether any prospective employer refused Zarling a job because of his age.  But Zarling represents that Bey will not testify that "any specific prospective employer did not offer Zarling a job because of his age."  (Doc. 120 at 8.)  This representation combined with the fact that the Court is dismissing Zarling's age discrimination claims will make the scenarios Abbott suggests unlikely to occur.  Accordingly, the Court will deny Abbott's Daubert Motion as it relates to Bey's report and related testimony.

## ORDER

Based upon the foregoing reasons and the files, records, and proceedings

herein, **IT IS HEREBY ORDERED THAT**:

1. Defendant's Motion for Summary Judgment **(Doc. 94)** is **GRANTED IN PART AND DENIED IN PART** as follows:

   a. Summary Judgment is **GRANTED** as to Plaintiff's claims of age, marital status, and reprisal discrimination (Counts 1, 2, and 4) and these claims are hereby **DISMISSED**;

   b. Summary Judgment is **DENIED** as to Plaintiff's breach of contract claim (Count 5);

   c. Summary judgment is **GRANTED** as to the portion of Plaintiff's defamation claim (Count 6) that is based on the call between Provost and Hofstadter but **DENIED** as to the portion of this claim based on Stewart's 2019 Performance Assessment of Zarling.

2. Defendant's <u>Daubert</u> Motion to Exclude Expert Testimony **(Doc. 86)** is **GRANTED IN PART AND DENIED IN PART** as follows:

   a. Defendant's Motion is **GRANTED** as to Smith's report and related testimony concerning hedonic damages;

   b. Defendant's Motion is **DENIED** as to Smith's rebuttal report and related testimony responding to Koellner;

    c.  Defendant's Motion is **DENIED** as to Bey's report and related testimony.

Dated:   March 27, 2023                s/Michael J. Davis
                                               Michael J. Davis
                                               United States District Court